## Lawrence B. THOMAS
v.
## E. J. KORVETTE, INC.
Civ. A. No. 40409.

United States District Court,
E. D. Pennsylvania.
July 6, 1971.

Memorandum and Amended Order
Sept. 7, 1971.

---

9. See Fed.R.Civ.P. 56(c).

James E. Beasley, Philadelphia, Pa., for plaintiff.

F. Hastings Griffin, Jr., Philadelphia, Pa., for defendant.

## OPINION AND ORDER

FULLAM, District Judge.

The plaintiff was employed as security manager of the King of Prussia store of the defendant when, on November 12, 1965, the defendant caused him to be arrested and prosecuted on a charge of larceny by employee. This criminal charge was later dismissed at a Justice of the Peace hearing, and the present action for false arrest, malicious prosecution and defamation of character followed.

Liability issues were tried first. The jury expressly found that there was no probable cause for plaintiff's arrest and prosecution, that the defendant was motivated by malice, and that certain disputed defamatory statements were made. Additional evidence was then presented on the damage issues, and the jury awarded compensatory damages in the sum of $250,000, and punitive damages in the sum of $500,000, making a total award of $750,000. The defendant has moved for judgment n. o. v. and for a new trial.

Plaintiff's evidence was substantially as follows: after serving as a police officer for fifteen years with a distinguished record, he was employed by the defendant as a security officer and later, on the basis of merit, was promoted to the position of security manager of the King of Prussia store. On November 12, 1965, at about 11:30 a. m., he went to the toy department to obtain a certain "getaway chase" game for his child's forth-

coming birthday. He had previously been advised that a shipment of these games was anticipated shortly, and he therefore inquired of the manager of the toy department. The manager went to a backroom and obtained one of the games, and handed it to the plaintiff. As the plaintiff was on his way toward the cash register in the toy department, where he intended to pay for his purchase, he spotted a woman who had previously been identified to him as a suspected shoplifter, and determined to follow her. His pursuit of the suspected shoplifter led him to the vicinity of the front door of the store. The plaintiff's automobile happened to be parked nearby, so, as a matter of convenience, he put his package in the trunk of his car, and returned to the interior of the store. Thereafter, his attention was diverted by reason of other pressing matters, and he forgot about the game until about 2:30 p. m., when he returned to the toy department, made another purchase, advised a cashier of his former purchase, and paid for both articles at the same time, whereupon he took his second purchase out to his automobile and placed it in the trunk on top of the former purchase. At that time, the sales slip for both purchases was still attached to the second purchase by a gummed tape.

It appears that a Mr. Brown, assistant manager of the store, had observed the plaintiff taking a package out through the front door and placing it in his automobile. He called the matter to the attention of his superiors, and, ultimately, the security manager of one of the defendant's other stores was called in to investigate. Plaintiff was called into the security office at about 3:30 or 4 o'clock that afternoon and confronted with the accusation of Mr. Brown. He readily agreed that he had placed the packages in his car, but claimed that they were paid for. He was escorted to his automobile, and the packages were removed, but no sales slip was then attached, and he was unable to substantiate his purchase by means of a sales slip. The packages were then "confiscated"

and the investigation continued inside the store.

Plaintiff testified that he identified the cashier to whom he had made payment for the purchases; she was interviewed and corroborated his statement. Nevertheless, because the sales slip could not be produced, plaintiff's explanation was not accepted. He thereupon became angry and resigned his position. The police were called, and he was placed under arrest.

The matter was scheduled for a preliminary hearing six days later, on November 18, 1965. In the meantime, plaintiff testified he had found the missing sales slip in the trunk of his car, in the well which held the spare tire. (The sales slip does not precisely correspond to the correct pricing of the two games; plaintiff contends that the cashier must have erred in ringing up the sale.) Plaintiff did not produce the sales slip or advise the defendant's representatives of its existence until some time during the preliminary hearing on November 18, 1965. At the conclusion of the hearing, the Justice of the Peace dismissed the charges, but ordered the plaintiff to pay the costs.

There was evidence (disputed) that during the interval between plaintiff's arrest and the preliminary hearing, Mr. Smith, the security agent investigating the matter, told at least one of the cashiers that the plaintiff had "over a thousand dollars worth of toys." There was also evidence that the defendant, during the same interval, circulated to all of its store security managers a notice advising them of plaintiff's arrest, in rather extravagant terms; however, the jury expressly found that the defendant did not abuse its privilege on this occasion.

Plaintiff testified that, since his arrest, he has been utterly unable to obtain employment in the security field. He obtained employment as a salesman of cosmetics, but, while engaged in this occupation, was asked to leave one of the defendant's stores, on the ground that he was a "security risk." In February of 1969, a prospective employer, checking

with the defendant for references, was told: "If you want a thief working for you, go ahead."

As can be seen from the foregoing recitation, the case involved many issues:

(1) Whether there was probable cause for the original arrest;

(2) Whether there was probable cause for continuing to press the prosecution at the Magistrate's hearing on November 18, 1965:

(3) Whether the alleged statements to the cashier amounted to actionable slander;

(4) Whether the letter to the security managers was libelous, and whether there was an abuse of the privileged occasion there involved;

(5) Whether evidence of the alleged derogatory statements in February of 1969 was admissible, either (a) as evidence of malice in connection with the earlier incident, or (b) as an independently actionable defamation.

The interrogatories to the jury on the liability phase of the case were framed in an attempt to elicit the required factual determinations on each of these issues. Thereafter, when the damage stage was reached, the jury was instructed to disregard the February 1969 incident, and to award only such damages as they might find stemmed from the 1965 incidents alone.

This was done on the theory that the 1969 incident, occurring long after the complaint was filed had not been pleaded in the original action; and that plaintiff's attempt to amend the complaint at trial to include damages arising from this incident was barred by the statute of limitations. On the other hand, it was my feeling that evidence concerning this incident was relevant on the issue of malice with respect to the 1965 incidents; hence, the fact that the jury did pass upon the conflicting versions of the parties during the liability phase of the trial could not properly be objected to. Upon reflection, I am inclined to believe that, if any error was committed, it was favorable to the defendant. The 1969 in-cident could properly have been regarded as part of a continuing series of acts by the defendant, and plaintiff should perhaps have been permitted to amend the complaint at trial, such amendment relating back to the original filing date and thus not barred by limitations. Be that as it may, I am satisfied that the defendant has no present grounds for complaint on this issue. The issue was raised in plaintiff's pretrial memorandum; the witnesses to it were listed in the final pretrial order; and the defendant had ample opportunity to meet the issue, and did in fact present evidence on the subject.

■ There is no merit to defendant's contention that this evidence was improperly admitted because the identity of the defendant's employee who allegedly made the defamatory statement was not established. Plaintiff's prospective employer telephoned the store, asked for references, was referred to the security manager, and spoke to a person who identified himself as the security manager. This is sufficient. Crist v. Pennsylvania Railroad Company, 96 F.Supp. 243 (W.D.Pa.1951); Kobierowski v. Commonwealth Mutual Insurance Company, 175 Pa.Super. 387, 105 A.2d 179 (1954); Pennsylvania Trust Company v. Ghriest, 86 Pa.Super. 71 (1926); 7 J. H. Wigmore on Evidence, § 2155 (3d ed. 1940).

■ The defendant contends that it was error to submit the issue of probable cause to the jury. It is, of course, correct that, when the facts are established, the issue of probable cause is solely for the court. Miller v. Pennsylvania Railroad, 371 Pa. 308, 89 A.2d 809 (1952); Hugee v. Pennsylvania Railroad, 376 Pa. 286, 101 A.2d 740 (1954). However, the underlying factual issues are for the jury, as are the inferences to be drawn from the facts. For example, in Simpson v. Montgomery Ward and Company, 354 Pa. 87, 46 A.2d 674 (1946), the court held that it was appropriate to submit to the jury the question of whether the person initiating the criminal

prosecution had an honest and reasonable belief that the plaintiff was guilty of theft. See also Lynn v. Smith, 281 F.2d 501 (3 Cir. 1960) (issue of good faith and reasonable investigation); Biggans v. Hajoca Corp., 185 F.2d 982 (3 Cir. 1950) (reasonableness of investigation); VanSant v. American Express Company, 169 F.2d 355 (3 Cir. 1948) (existence of honest and reasonable belief in plaintiff's guilt); Byers v. Ward, 368 Pa. 416, 84 A.2d 307 (1951) (adequacy of investigation).

■ In the present case, the existence or non-existence of probable cause depended in large part upon disputed factual issues. Plaintiff testified that the cashier corroborated his purchase of the toys, whereas the defense evidence was squarely contrary. The defendant's evidence was that it would be a clear violation of company regulations for the plaintiff to take merchandise out through the front doors of the store, even if it had been purchased; whereas the plaintiff testified that this was common practice, and that managerial employees were exempt from any such regulation. There was dispute as to whether the two packages were tied together when they were found in the trunk of plaintiff's car, and even as to the color of the string with which they were tied, and the significance of this circumstance. There were further issues with respect to the extent and reasonableness of defendant's investigation of the incident, the information supplied by the plaintiff and other employees, whether the circumstances of the production of the receipt at the Justice of the Peace hearing should have, or did, convince the defendant's employees of plaintiff's innocence, and many others. In my opinion, all of these issues were for the jury. On the authority of such cases as Hugee v. Pennsylvania Railroad, supra, and Van-Sant v. American Express Company, supra, it would have been error to declare that, as a matter of law, there was probable cause in this case. If the jury resolved the underlying factual disputes in plaintiff's favor, as they obviously did,

a finding of lack of probable cause would be justified.

■■ The jury was instructed that, as a matter of law, the criminal prosecution should be deemed to have been terminated in plaintiff's favor. Defendant asserts that this ruling was erroneous, since the Justice of the Peace imposed costs on the defendant, and made statements at the conclusion of his hearing (excluded from evidence at trial) indicating that he was not entirely convinced of the plaintiff's innocence. I believe the ruling was correct. Under Pennsylvania law, it is not necessary to establish that the prosecution was favorably terminated on the merits. Woodyatt v. Bank of Old York Road, 408 Pa. 257, 182 A.2d 500 (1962) (charges withdrawn by the prosecutor). All that is required is that the termination must be consistent with the innocence of the accused. See Restatement of Torts, § 660. The present case is unlike Alianell v. Hoffman, 317 Pa. 148, 176 A. 207 (1935), where it was held that termination of the criminal prosecution as a result of a compromise, in exchange for return of the allegedly stolen property, was not a favorable termination, since it was not consistent with the innocence of the accused under those circumstances. In the present case, the termination was certainly consistent with plaintiff's innocence.

■ It is contended that no evidence should have been received with respect to the alleged slanderous statement to a fellow employee that "Mr. Thomas had over a thousand dollars worth of toys, or something to that effect." It is true that this incident was not specifically pleaded in the complaint, although the complaint can properly be interpreted as including the charge. It is also correct that plaintiff's pretrial statement and the final pretrial order were singularly uninstructive with respect to this incident. However, it is clear that the incident was closely related to the main thrust of plaintiff's claim; the evidence was admissible on the issue of malice in any event; the alleged incident

involved two principal witnesses in the case, both of whom were able to, and did, fully testify with regard to it. In short, the defendant was not really surprised and, in any event, was in no way prejudiced.

It should perhaps be mentioned in this connection that this case was one of several in which the court was experimenting with certain revisions in pretrial procedures. It became obvious, as the trial progressed, that counsel had perhaps not fully appreciated the requirements of the new method. I believe it was a proper exercise of discretion in this instance to be somewhat flexible in dealing with the problem of attempting to confine the parties to the issues enumerated before trial.

As indicated in the discussion thus far, I have concluded that the defendant's motion for a judgment n. o. v. must be denied. And while there is a distinction between the quantum of proof required to escape a directed verdict and the quantum of proof which would justify the refusal to grant a new trial on the basis of the weight of the evidence (admittedly, however, a somewhat elusive distinction), I have concluded that, on the liability issues, the jury's verdict should be permitted to stand. To set aside the verdict and grant a new trial in this case would mean disregarding the jury's evaluations of credibility, and substituting contrary evaluations. Credibility of witnesses is peculiarly within the province of the jury. The motions for judgment n. o. v. and for a new trial, insofar as they relate to liability issues, will be denied.

However, the jury's appraisal of damages is patently excessive, and cannot be permitted to stand. The evidence established that, up to the date of trial, plaintiff had sustained the following pecuniary losses:

| | | |
|---|---|---|
| Bail bond | - $ | 65.00 |
| Attorney fee | - | 350.00 |
| Employment agency fee | - | 310.00 |
| Wages lost between jobs | - | 950.00 |
| TOTAL | | $ 1,675.00 |

In addition, plaintiff claimed loss of future earning capacity by reason of his inability to obtain employment in the security field. The difficulty with this assertion is that he has been earning more as a salesman than he was earning at Korvette's. However, there was evidence that employment in the security field, other than at Korvette's, would pay approximately $600 per year more than plaintiff's present income.

Obviously, plaintiff did sustain substantial general damages for such intangibles as injury to feelings, humiliation, embarrassment, damage to reputation, etc. His life has been substantially changed as a result of the arrest. Exclusion from his chosen field of endeavor, which he very much enjoyed and in which he was quite successful, is an element of damage of considerable magnitude, even though incapable of precise measurement.

Giving all these factors their appropriate weight, however, I find it impossible to justify an award of $250,000 as representing actual damages sustained by the plaintiff. In my judgment, the most that a reasonable jury could have awarded under these circumstances is $100,000, and even that may be generous.

On the issue of punitive damages, there are several points to be discussed. Defendant contends that it was error to admit into evidence the $155,-600,000 net worth of Spartan Industries, Inc., the successor to E. J. Korvette, Inc., defendant. Defendant concedes, of course, that under Pennsylvania law the net worth of the defendant is admissible as an aid in determining punitive damages. Aland v. Pyle, 263 Pa. 254, 106 A. 349 (1919). Since there was no evidence to the contrary, I believe it was proper to assume the normal situation, that a successor corporation which has acquired all of the assets of an on-going business has assumed responsibility for outstanding tort claims. Bouton v. Litton Industries, Inc., 423 F.2d 643 (3 Cir.

1970). There is no reason why punitive damages should not also be included. Investors Preferred Life Insurance Company v. Abraham, 375 F.2d 291 (10 Cir. 1967). Moreover, there was no proof that the net worth of Spartan Industries is significantly greater than that of the predecessor corporation. In any event, the deterrence rationale of punitive damages makes it logical to conclude that the net worth of the successor corporation, the present defendant, would be the relevant circumstance.

Contrary to the defense contention, punitive damages cannot be ruled out as a matter of law. Viewing the evidence in the light most favorable to the plaintiff, the jury could rationally impose that sanction.

However, I am convinced that the jury's award was excessive. On this issue, Pennsylvania law is in a somewhat illogical state. On the one hand, it is held that evidence of the financial worth of the defendant is relevant, in order to pass upon the amount which might act as a deterrent in a particular situation. Aland v. Pyle, supra. On the other hand, it is held that the amount of punitive damages must bear a reasonable relation to the amount of compensatory damages. Hughes v. Babcock, 349 Pa. 475, 37 A.2d 551 (1944). In many situations, there is an inherent contradiction in these two principles. For example, a wealthy individual who intentionally and maliciously damages his neighbor's automobile or breaks his arm might not be deterred from repeating this conduct by the imposition of punitive damages bearing a reasonable relationship to the actual harm done. On the other hand, in the case of a business enterprise, absent some financial profit from the wrongful conduct, it is probably safe to assume that any substantial amount of punitive damages would have deterrent effect, irrespective of the size of the corporate defendant. Whether a punitive award would be covered by liability insurance, and the effect of such an award upon insurance costs, would also seem to be relevant considerations.

■ Be all that as it may, it is my view that the concept of reasonable relationship between a punitive award and the actual damages should vary, depending upon (a) the egregiousness of the defendant's wrongful conduct and (b) the relative generosity of the compensatory award. It is my view that a generous compensatory award should not be further exaggerated by multiplication in computing punitive damages. Taking into consideration all of the appropriate factors, I have concluded that punitive damages in the present case should not be permitted to exceed $50,000. I believe this result is in accord with the law of Pennsylvania.

### MEMORANDUM AND AMENDED ORDER

On July 6, 1971, in disposing of post-trial motions in this case, I entered an order denying defense motions on the liability issues, but providing that a new trial on damages would be granted unless plaintiff filed a remittitur, reducing the total verdict from $750,000 to $150,000. Plaintiff now seeks an amendment to that order, adding the following language:

"* * * however, the plaintiff's filing of the remittitur shall not be construed to mean that the plaintiff agrees with the court's judgment, and should the defendant thereafter file a notice of appeal, the plaintiff shall have ten (10) days thereafter in which to file a cross-appeal, said cross-appeal preserving to the plaintiff his right to challenge the court's discretion in ordering the remittitur."

■ Under the terms of the original order of July 6, if plaintiff rejects the remittitur, there will be a new trial of damages, and no final, appealable judgment until after retrial. If plaintiff accepts the remittitur, there will be a final judgment in his favor. Whether, on appeal from such judgment, plaintiff

can, by cross-appeal, challenge the propriety of the remittitur, is a question for the appellate tribunal to decide.

In Woodworth v. Chesbrough, 244 U.S. 79, 37 S.Ct. 583, 61 L.Ed. 1005 (1917), the Supreme Court indicated that acceptance of the remittitur precludes an appeal by the plaintiff; however, that case may not be squarely apposite, since it involves a remittitur imposed by the Court of Appeals as a condition upon affirmance of the judgment.[1] Some circuits have permitted appeals by plaintiffs after filing the remittitur, where this action was taken "under protest" and the judgment had not been paid. *See, e. g.,* Steinberg v. Indemnity Insurance Co. of North America, 364 F.2d 266 (5th Cir. 1966). This issue has apparently not been decided for this Circuit.

Issues relating to appellate jurisdiction and the scope of review are exclusively within the province of the appellate courts. *See, e. g.,* Tye v. Hertz Drivurself Stations, 173 F.2d 317, 318 (3rd Cir. 1949); Maxwell v. Enterprise Wall Paper Mfg. Co., 131 F.2d 400, 402 (3rd Cir. 1942). A district court's views as to finality or appealability are not controlling. Flynn & Emrich Co. v. Greenwood, 242 F.2d 737, 738–739 (4th Cir.), cert. denied, 353 U.S. 976, 77 S. Ct. 1060, 1 L.Ed.2d 1137 (1957).

It is apparent, therefore, that the amendment requested by the plaintiff, which would purportedly confer a right of appeal, is too broad. On the other hand, however, I am satisfied that no useful purpose would be served by making it difficult for the plaintiff to attempt to assert whatever right of appeal he may have. Accordingly, the order of July 6, 1971, will be amended to permit plaintiff, if he so desires, to file a remittitur "under protest," and to seek review of this Court's exerise of discretion in disposing of the issue of excessiveness.

I consider this procedure especially appropriate in this case, in view of the amount of the reduction, and the somewhat clouded question of the proper relationship between actual and punitive damages.

## AMENDED ORDER

And now, this 7th day of September, 1971, it is ordered:

1. The defendant's motions for judgment n. o. v. and for a new trial, insofar as they relate to liability issues, are denied.

2. If the plaintiff shall, within twenty (20) days from the date of this amended order, file a remittitur of all compensatory damages in excess of $100,000, and of all punitive damages in excess of $50,000, defendant's motion for a new trial will be denied in all respects; otherwise, a new trial, limited to the issues of damages, will be granted. Such remittitur may be filed "under protest," and the filing thereof shall be without prejudice to the exercise of whatever right of appeal plaintiff may have. The time for appeal by the plaintiff is extended for a period of ten (10) days after the filing of a notice of appeal by the defendant.

---

1. In Grunenthal v. Long Island Railroad Co., 393 U.S. 156, 89 S.Ct. 331, 21 L.Ed. 2d 309 (1968) and Neese v. Southern Railway Co., 350 U.S. 77, 76 S.Ct. 131, 100 L.Ed. 60 (1955), the Supreme Court declined to decide whether courts of appeals can review trial court orders based upon excessiveness of jury verdicts. Both cases were decided on the assumption that such appellate review was proper. The Court noted that all circuits have so held. (*Grunenthal,* 393 U.S. at 157, footnote 3, 89 S.Ct. 331.)